[No. B053181. Second Dist., Div. Seven. Feb. 24, 1993.]

OKSANA R. BIHUN, Plaintiff and Respondent, v.
AT&T INFORMATION SYSTEMS, INC., Defendant and Appellant.

984

COUNSEL

Gartner & Young, Lawrence J. Gartner, Greines, Martin, Stein & Richland, Kent L. Richland, Barbara M. Ravitz and Barry M. Wolf for Defendant and Appellant.

Grassini & Wrinkle and Roland Wrinkle for Plaintiff and Respondent.

**OPINION**

**JOHNSON, J.**—Defendant, AT&T Information Systems, appeals from a judgment in favor of Oksana Bihun, a former employee, in her suit for damages arising from sexual harassment by one of defendant's senior officials. We affirm.

## FACTS AND PROCEEDINGS BELOW

Ms. Bihun worked for defendant or one of its predecessors from 1977 to 1985. Ms. Bihun became an area personnel manager in 1983. Her immediate supervisor was Ms. Jimetta Moore, the district personnel manager. Ms. Bihun received a "number one" staff rating and was eligible for promotion to the next level of management in January 1984.

In March 1984, Peter Fellows, a longtime employee of defendant, was transferred from Denver to Los Angeles as area vice-president. Fellows's sexual harassment of Ms. Bihun began almost immediately.

On their first meeting, Fellows winked at Ms. Bihun and lightly brushed his hand against hers. Later that month while Ms. Bihun and Ms. Moore were working after hours in Ms. Moore's office, Fellows walked in with his shirt unbuttoned and his pants unzipped. He pressed his body against Ms. Bihun's right shoulder. Ms. Bihun jumped up and left Ms. Moore's office. As she retreated down the hall she heard Fellows softly calling her name, "Oksana." Again in March, at a birthday luncheon for Ms. Moore, Fellows sat down next to Ms. Bihun and started rubbing her leg with his foot. When she kicked his leg away, Fellows stood up and thrust his groin at her. He pointed to his groin area and told Ms. Bihun there was a food spot there and asked her to rub it off. Later that day, Fellows summoned Ms. Bihun to his office. When she arrived he asked her to have dinner with him that evening. She declined. Fellows then asked her to go to the beach with him the following Saturday. Again, she declined. Fellows then leaned back in his chair revealing his open fly.

The week after these events took place Fellows walked into Ms. Bihun's office, closed the door, and told her they were having dinner together that evening. Ms. Bihun said "No," but Fellows insisted, stating that it was "strictly business" to discuss staff and job-related matters. Ms. Bihun felt threatened and not at liberty to refuse. They drove to the restaurant in separate cars. When they arrived Fellows presented Ms. Bihun with a bouquet of flowers. After they were seated Fellows began telling Ms. Bihun about his unsatisfactory sex life with his wife and his need for extramarital affairs. Then he told her a major reorganization of the company was going to take place soon and if she "played her cards right" she could have any job she wanted. He asked her if she would like Ms. Moore's job and remarked Ms. Moore could be made to disappear. Fellows then leaned across the table and began playing with her earring. He told her she looked like a gypsy and asked her to have an affair with him. He went on to say he did pretty much what he wanted in the company and no one questioned him. For example, he

told her, he once hired a waitress from a restaurant to be his secretary because of her large breasts.

The next day, Ms. Bihun told Ms. Moore what had happened at the restaurant. Ms. Moore went to Fellows and complained about his treatment of Ms. Bihun. Fellows told Ms. Moore it was none of her business. After that, the incidents of direct sexual harassment by Fellows became less frequent. Once, while they were passing in the hall, Fellows cupped his hand on her breast. On another occasion Fellows asked Ms. Bihun if she had "softened up yet." And, in November 1984, Fellows asked her "Have you changed your mind?"

Fellows retaliated against Ms. Bihun for rejecting his advances. Her budgetary responsibilities were taken away from her and branch managers stopped dealing with her and took their work to another personnel manager on the same level as Ms. Bihun. A few months later, Fellows accused Ms. Bihun of forging her supervisor's signature on a memo. All her responsibilities were taken away from her; she had nothing to do.

In December 1984, Ms. Bihun went on disability leave. Her doctor diagnosed her as suffering from an "adjustment disorder" coupled with anxiety and depression. He attributed this to what had occurred at work.

Although Ms. Bihun made numerous complaints about Fellows to defendant's supervisory personnel, no one ever contacted her or Ms. Moore regarding these complaints. While she was on disability leave, Fellows resigned.

The day before Ms. Bihun was due to return to work she was told not to come back for another week because there was no job for her. When she did return she was demoted two levels and placed in sales where she had no background or skills. Shortly thereafter Ms. Bihun resigned.

When Ms. Bihun took disability leave and sought psychological help she suffered from headaches, dizziness, vomiting, diarrhea, weight loss, sleep disturbances, teeth grinding, a facial twitch, crying spells and depression. Her psychologist testified that, in his opinion, the incidents of sexual harassment would continue "to affect her in the future." At the time of trial, Ms. Bihun was employed as an attorney with the Los Angeles County Public Defender.

The case went to the jury on Ms. Bihun's claims of sexual harassment and subsequent retaliation for complaining about the harassment in violation of

California's Fair Employment and Housing Act (FEHA).[1] The jury awarded Ms. Bihun compensatory damages of $1.5 million and $500,000 in punitive damages. The trial court added $893,698 in prejudgment interest, $151,468 in attorney fees plus costs and interest from the date of the verdict. The total judgment against defendant was for $3,057,369.34.

## I. EVIDENCE OF FELLOWS'S SEXUAL MISCONDUCT WITH OTHER FEMALE EMPLOYEES WAS PROPERLY ADMITTED.

Defendant argues the trial court improperly admitted the following evidence of Fellows's sexual misconduct with other female employees.

1. Fellows's superiors had received an anonymous letter claiming Fellows was having an extramarital affair with his executive assistant and they had moved their "love nest" from Denver to Los Angeles.

2. Plaintiff's supervisor was told by her supervisor, prior to Fellows's transferring to Los Angeles, "that there were instances where Mr. Fellows was unprofessional around women."

3. When plaintiff recounted her experiences with Fellows to her supervisor, her supervisor stated, "You, too?"

4. Plaintiff's supervisor testified another supervisor told her two other female employees "were having the same problem with Fellows."

Defendant contends this evidence should have been excluded because it was: (1) irrelevant to any issue in the case; (2) hearsay, not subject to an exception; (3) unduly prejudicial; and (4) impermissible evidence of character. We consider each of these objections in order.

### 1. *The Evidence Was Relevant*

█ Defendant claims the only possible relevance of this evidence was to demonstrate defendant's knowledge of Fellows's conduct and failure to properly investigate or take corrective action. However, defendant argues, under our decision in *Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 608, footnote 6 [262 Cal.Rptr. 842], neither defendant's knowledge of Fellows's conduct nor its response to that knowledge was

---

[1]Government Code section 12940 declares it an unlawful employment practice for an employer: to sexually harass an employee (subd. (h)); to "discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden [by FEHA]" (subd. (f)); or "to fail to take all reasonable steps necessary to prevent [sexual] harassment from occurring" (subd. (i)).

relevant because an employer is strictly liable for acts of sexual harassment by a supervisor, such as Fellows.

Defendant's decision to embrace *Fisher* comes too late. Its position on appeal, that employer knowledge is irrelevant to employer liability, is directly contrary to the position it took at trial. Defendant cannot be allowed to change the theory of its case on appeal in order to argue evidence that was relevant at trial is now irrelevant. (See *Richmond* v. *Dart Industries, Inc..* (1987) 196 Cal.App.3d 869, 874 [242 Cal.Rptr. 184].)

■ Furthermore, as discussed below, the employer's knowledge and failure to act are relevant to the award of punitive damages. (Civ. Code, § 3294, subd. (b).)

■ Defendant argues the anonymous tip Fellows was sharing a "love nest" with one of his subordinates was not relevant even if knowledge was in issue because an affair between employees does not necessarily involve sexual harassment. In this case, however, Fellows had proposed to Ms. Bihun they have an affair and told her if she consented he would get her any job she wanted. These statements, taken together with the information about Fellows's affair with his executive assistant, are relevant to both categories of sexual harassment: quid pro quo and hostile work environment. (See *Fisher* v. *San Pedro Peninsula Hospital, supra,* 214 Cal.App.3d at p. 607.) Information about the affair could reasonably be taken by Ms. Bihun as indicating Fellows meant what he said about getting her any job she wanted if she would have sex with him. Such information could also reasonably suggest the opposite result if she refused.

2. *The Evidence Was Not Hearsay.*

■ Defendant next contends even if the challenged evidence was relevant to the issues of defendant's knowledge of Fellows's conduct or the existence of a hostile work environment it was only relevant if offered to prove the truth of the matters asserted. But, in that event, the evidence was inadmissible hearsay. We disagree.

The challenged evidence was not admitted to prove the truth of the matters asserted, e.g., that Fellows was maintaining a "love nest" with his executive assistant. The jury was so instructed. Rather, the evidence was offered to show defendant had knowledge of Fellows's reputation and the complaints about his conduct with female employees but took no steps to investigate or discipline Fellows. As such, the evidence was admissible as "operative facts" because it demonstrated an issue in the case: defendant's

knowledge of Fellows's behavior and complaints about that behavior. As noted above, defendant itself made the question of knowledge an issue on the question of liability. ■■■ Furthermore, the issue of knowledge is relevant to the award of punitive damages. "If an employer, after knowledge or opportunity to learn of his agent's misconduct, retains the wrongdoer in service, the employer may be liable in punitive damages for the misconduct."[2] (*J. R. Norton Co.* v. *General Teamsters, Warehousemen & Helpers Union* (1989) 208 Cal.App.3d 430, 445 [256 Cal.Rptr. 246].)

### 3. The Evidence Was Not Unduly Prejudicial.

■■■ Defendant argues that even if evidence of Fellows's conduct with other female employees was relevant its probative value was substantially outweighed by its undue prejudice. (Evid. Code, § 352, subd. (b).) We find no merit in this argument.

■■■ In determining whether to exclude relevant evidence under Evidence Code section 352, the trial court is vested with broad, but not absolute, discretion. (*Burke* v. *Almaden Vineyards* (1978) 86 Cal.App.3d 768, 774 [150 Cal.Rptr. 419]; *Garfield* v. *Russell* (1967) 251 Cal.App.2d 275, 279 [59 Cal.Rptr. 379].) In reviewing the trial court's exercise of that broad discretion, an appellate court is not authorized to substitute its judgment for that of the trial court. In other words, a difference of opinion is not grounds for reversal. (*Travelers Ins. Co.* v. *Lesher* (1986) 187 Cal.App.3d 169, 193 [231 Cal.Rptr. 791].)

■■■ Defendant argues the challenged evidence branded Fellows as an adulterer, womanizer and harasser. Actually, those brands were placed on Fellows by the testimony of the plaintiff, Ms. Bihun, and her supervisor, Ms. Moore, who described their personal observations of Fellows's conduct. While the challenged evidence may have supported the testimony of Ms. Bihun and Ms. Moore, it is not "unduly prejudicial" for that reason. "The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues. . . . '[P]rejudicial' is not synonymous with 'damaging.' " (*People* v. *Yu* (1983) 143 Cal.App.3d

---

[2] In the present case, the trial court instructed the jury that to establish oppression or malice for purposes of punitive damages plaintiff must show "That the act of oppression or malice was on the part of an officer or managing agent of the corporation or an officer or managing agent of the corporation had advance knowledge of the reputation of the employee whose conduct is found to be malicious or oppressive and with a conscious disregard for the rights and safety of others employed that person, or an officer or managing agent of the corporation authorized or ratified the conduct which is found to be oppressive or malicious." This is a modification of BAJI No. 14.73.1 (7th ed. 1992 pocket pt.) page 103.

358, 377 [191 Cal.Rptr. 859].) We fail to see how a plaintiff can prosecute an action for sexual harassment against a corporate employer without introducing evidence of sexual harassment by an employee. To say this evidence is unduly prejudicial because it "brands" the employee as an "harasser" is like saying evidence the defendant committed a murder is unduly prejudicial because it "brands" the defendant as a "murderer."

The cases cited by defendant are not on point. In *Coburn v. State Personnel Bd.* (1978) 83 Cal.App.3d 801 [148 Cal.Rptr. 134], the board upheld the dismissal of a male employee of a state hospital on the ground he had engaged in sexual conduct with a male patient. The court ordered the decision set aside, in part, because the board considered evidence of one 10-year-old misdemeanor conviction for sexual misconduct. The court held the evidence was not admissible to show a common design, plan or scheme because the conviction was too remote in time and not shown to be sufficiently similar to the current alleged misconduct. (*Id.* at p. 811.) In support of its holding the court cited the other two cases relied upon by defendant here: (*People v. Thomas* (1978) 20 Cal.3d 457 [143 Cal.Rptr. 215, 573 P.2d 433] and *People v. Kelley* (1967) 66 Cal.2d 232 [57 Cal.Rptr. 363, 424 P.2d 947]. Both of these cases, like *Coburn*, involved the question whether a prior conviction was sufficiently similar and sufficiently fresh to prove a common plan or scheme. (83 Cal.App.3d at p. 810.)

The present case does not involve evidence of a prior conviction for sexual misconduct. Nor was the challenged evidence introduced to show a common design, scheme or plan on the part of Fellows or defendant. But even if it was, it would not suffer from the defects of remoteness and dissimilarity present in *Coburn, Thomas* and *Kelley.* The conduct described in the challenged evidence was occurring simultaneously with Fellows's harassment of Ms. Bihun. The conduct was similar in nature to Fellows's conduct with Ms. Bihun. (See discussion, *ante,* page 985.)

### 4. *The Evidence Was Not Introduced to Prove Fellows's Conduct on a Specific Occasion.*

■ Defendant's final argument is the challenged evidence constituted character evidence prohibited under Evidence Code section 1101, subdivision (a).[3] This argument fails because the evidence was not introduced to prove Fellows's conduct on a particular occasion, but to prove *defendant's*

---

[3]Evidence Code section 1101, subdivision (a) provides in relevant part, "[E]vidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."

knowledge or opportunity to learn of Fellows's misconduct. As we have previously noted, Fellows's character or personality in the workplace was relevant to the issues of defendant's liability and punitive damages. (See discussion, *ante*, pp. 987-988.) Any otherwise admissible evidence, including evidence of reputation, is admissible to prove a person's character or character trait when character or a trait of character is an ultimate fact in dispute in the action. (*Carr* v. *Pacific Tel. Co.* (1972) 26 Cal.App.3d 537, 544 [103 Cal.Rptr. 120]; and cf. *Pugh* v. *See's Candies, Inc.* (1988) 203 Cal.App.3d 743, 756-757 [250 Cal.Rptr. 195].)

## II. THE JURY WAS PROPERLY INSTRUCTED ON WILFUL SUPPRESSION OF EVIDENCE.

In February 1990, three months before trial, plaintiff served on defendant a demand that it produce Fellows's personnel file at trial. (Code Civ. Proc., § 1987, subd. (c).)[4] Defendant filed an objection to this demand on the grounds production of Fellows's personnel file would violate his right to privacy and there was nothing in Fellows's file relevant to this litigation. Plaintiff did not seek an order for the production of the file.

At the time defense counsel filed the objection to the production of the file on grounds of privacy and relevancy, he had never seen Fellows's personnel file. In fact, he had been informed by defendant several months earlier Fellows's personnel file could not be located. Defense counsel never advised the court or plaintiff the file was missing until, during trial, plaintiff renewed her demand for the production of the file. ■■■ Then, for the first time, defense counsel informed the court and plaintiff: "Attempts have been made to locate Mr. Fellows's file. It cannot be located."[5]

At plaintiff's request, the trial court gave the jury the following instruction on wilful suppression of evidence:

[4]Code of Civil Procedure section 1987, subdivision (c) provides that within 20 days before trial a party may request an opposing party to bring to the trial "books, documents or other things." Within five days thereafter, the party of whom the request is made "may serve written objections to the request or any part thereof, with a statement of grounds." Thereafter, on noticed motion and a showing of good cause, "the court may order production of items to which objection was made . . . ."

[5]AT&T argues on appeal the trial court "plainly misunderstood the nature and workings of Code of Civil Procedure section 1987, subdivision (c)" in using counsel's failure to disclose the fact the file was missing as a basis for the wilful suppression of evidence instruction. Defense counsel, Mr. Gartner, argued below and continues to insist on appeal he had no duty to disclose the fact the file was missing because no such duty is specifically imposed by Code of Civil Procedure section 1987, subdivision (c). He notes, in contrast, that under Code of Civil Procedure section 2031, subdivision (f)(2) a party unable to comply with an inspection demand during discovery must state the reason, e.g., "the item . . . has never existed, has been destroyed . . . lost . . . misplaced, or stolen . . . ."

This argument totally ignores the fact that when he objected to the request to produce the file on the grounds of privacy and relevancy he acted in bad faith (Code Civ. Proc., § 128.5)

"If you find that defendant AT&T Information Systems, Inc. wilfully suppressed the personnel file of Peter Fellows, you may draw an inference that there was something damaging to defendant's case contained in that personnel file. Such an inference may be regarded by you as reflecting defendant's recognition of the strength of plaintiff's case generally and/or the weakness of its own case. The weight to be given such circumstance is a matter for your determination."

Defendant contends there was no evidence to support this instruction and the instruction misstates the law. We reject both these contentions.

■ The substantial evidence test applies to jury instructions as well as judgment (*Barry* v. *Raskov* (1991) 232 Cal.App.3d 447, 458 [283 Cal.Rptr. 463]), and it is prejudicial error to instruct the jury on wilful suppression of evidence when there is no evidence to support the instruction. (*County of Contra Costa* v. *Nulty* (1965) 237 Cal.App.2d 593, 598 [47 Cal.Rptr. 109].) However, contrary to defendant's position, a wilful suppression instruction does not require direct evidence of fraud.

Defendant relies principally on *Thor* v. *Boska* (1974) 38 Cal.App.3d 558 [113 Cal.Rptr. 296], a case which did not involve an instruction on wilful suppression of evidence. *Thor* was a medical malpractice case in which

and, in our view, in violation of the ethical duty of an attorney "[t]o employ . . . such means only as are consistent with truth . . . ." (Bus. & Prof. Code, § 6068, subd. (d).) Attorney Gartner admitted at trial he had never seen Fellows's personnel file and he knew it could not be located at the time he responded to plaintiff's request for production. Nevertheless he asserted to plaintiff disclosure of the contents of the file would violate Fellows's right of privacy *and* the contents of the file were "irrelevant to the instant case." Although these were legal conclusions they carried with them an implicit factual assertion. The implicit assertion of fact was Mr. Gartner had reviewed the contents of the file. There is no other way he could make a meritorious claim the contents were irrelevant to the action or that their production would invade Fellows's privacy. It turns out, however, this assertion of fact was false. Therefore, his opposition to the request to produce was "totally and completely without merit." (Code Civ. Proc., § 128.5, subds. (a), (b).) More serious, Mr. Gartner employed a dishonest means of avoiding production of the requested file. Rather than tell the truth, that the file had been lost or destroyed, he asserted, without any factual basis, that the file contained nothing relevant to this action and production of the file would violate Fellows's right of privacy. Business and Professions Code section 6068, subdivision (d) states it is the duty of an attorney, "To employ, for the purpose of maintaining the causes confided to him or her such means only as are consistent with truth, and never to seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law." Although counsel for plaintiff was entitled to challenge the asserted grounds for refusing to produce the file, he was also entitled to rely on defense counsel's good faith and truthfulness in not challenging the asserted grounds for refusing to produce the file. (Cf. *Drociak* v. *State Bar* (1991) 52 Cal.3d 1085, 1088 [278 Cal.Rptr. 86, 804 P.2d 711].) Of course, had he known the truth, that the file could not be located, he could have taken steps to assure himself a diligent search had been made or requested other files that might contain the same or similar information as contained in the missing personnel file.

defendant admitted during discovery he was unable to produce his original clinical records concerning his treatment of plaintiff. He "assume[d] that they were thrown away." (*Id.* at pp. 560-561.) Defendant claimed, however, he had verbatim copies of the records. This claim was later called into question because plaintiff testified that when she first showed defendant the lump on her breast he drew a diagram showing its location. No such diagram appeared in the copies of the lost original records. (*Id.* at p. 561.) Prior to trial, defendant admitted he had been negligent at some point in his treatment of plaintiff and on the strength of that admission obtained a ruling from the trial court that any reference to the unavailability of his original records would be unduly prejudicial. (*Ibid.*)

In reversing judgment for the defendant in *Thor* the appellate court found defendant's admission of negligence was "ephemeral" at best and did not justify exclusion of evidence of the missing files. The trial court's error was prejudicial because: "The fact that defendant was unable to produce his original clinical record concerning his treatment of plaintiff after he had been charged with malpractice, created a strong inference of consciousness of guilt on his part. He apparently claimed to have an innocent explanation: exact copying to make the records more legible and inadvertent loss of the originals. On that issue, at least, plaintiff's testimony that he did not copy the diagram drawn in 1965 would have been of relevance. The issue was, however, never tried. The court apparently felt that even if the jury did not accept the explanation—which, if believed, would have made the suppressed evidence irrelevant (Evid. Code, § 403)—the prejudicial effect would outweigh the probative value because negligence was admitted." (38 Cal.App.3d at pp. 565-566.)

*Thor* is clearly distinguishable from the case before us. *Thor* did not involve an instruction on wilful suppression of evidence and, therefore, did not address the showing necessary for such an instruction. The case certainly does not stand for the proposition asserted by defendant: that a wilful suppression instruction is only proper where the party proposing the instruction can point to some direct evidence the opposing party deliberately destroyed a specific piece of material evidence.

*Thor* is distinguishable from the present case in another important way. In *Thor*, the court held the fact the defendant was unable to produce his original clinical records after he had been sued for malpractice, "created a strong inference of consciousness of guilt on his part." (38 Cal.App.3d at p. 565.) But at least, in *Thor*, the defendant admitted up front the records had been lost or destroyed. In our case the defendant not only was unable to produce records it clearly could anticipate would be requested after it was sued, when

those records were requested it covered up the fact the records had been lost or destroyed and did not reveal this fact until forced to do so in the middle of trial. Arguably, the facts in the present case raise an even stronger inference of consciousness of guilt on defendant's part than the facts in *Thor*.

In the present case, the following facts provided sufficient circumstantial evidence of wilful suppression for the issue to go to the jury: (1) Although they resigned within a few months of each other, Fellows's personnel file could not be located but Ms. Bihun's file was found; (2) the disappearance of Fellows's file was covered up by defendant; (3) defendant's rules require maintenance of resigned employees' personnel files if a matter is in litigation; (4) it was reasonably probable Fellows's performance evaluations and any complaints of sexual harassment would be in his personnel file. Considering the evidence in the light most favorable to respondent (*County of Contra Costa v. Nulty, supra,* 237 Cal.App.2d at p. 594), we find no error in giving the jury an instruction on wilful suppression of evidence.

█ Defendant contends the instruction the trial court gave misstated the law because it told the jurors if they found the file was wilfully suppressed they could draw an inference the file contained something damaging to defendant's case and such inference could be regarded as reflecting defendant's recognition of the strength of plaintiff's case generally or the weakness of defendant's case or both.

It is true the instruction the trial court gave goes beyond the language of BAJI No. 2.03[6] and Evidence Code section 413.[7] It is, however, a correct statement of the law. Code of Civil Procedure former section 1963, subdivision 5, permitted the jury to infer "That evidence wilfully suppressed would be adverse if produced." Evidence Code section 413 was not intended as a change in the law. Rather, "[s]ection 413, taken together with section 412, restates in substance the meaning that had been given to the presumptions appearing in subdivisions 5 and 6 of Code of Civil Procedure Section 1963." (Cal. Law Revision Com. com., West's Ann. Evid. Code (1966 ed.) § 412, p. 295.) Furthermore, although *Thor v. Boska, supra,* did not involve an instruction on wilful suppression of evidence, the court did discuss the effect to be given to evidence of spoliation. The court stated the proponent of such evidence "should be entitled to an instruction that 'the adversary's

---

[6]BAJI No. 2.03 provides: "If you find that a party wilfully suppressed evidence in order to prevent its being presented in this trial, you may consider that fact in determining what inferences to draw from the evidence."

[7]Evidence Code section 413 provides: "In determining what inferences to draw from the evidence or facts in the case against a party, the trier of fact may consider, among other things, the party's failure to explain or to deny by his testimony such evidence or facts in the case against him, or the wilful suppression of evidence relating thereto . . . ."

conduct may be considered as tending to corroborate the proponent's case *generally*, and as tending to discredit the adversary's case *generally*.'" (38 Cal.App.3d at p. 567, quoting McCormick on Evidence (2d ed. 1972) § 273, p. 661 (italics added by the court).)

### III. There Was Sufficient Evidence Ms. Bihun Would Continue to Experience Emotional Distress in the Future.

 Defendant claims the trial court erred in instructing the jury as to Ms. Bihun's life expectancy because there was no substantial evidence she would suffer lifelong emotional distress as a result of defendant's conduct. We disagree.

A plaintiff may recover for detriment reasonably certain to result in the future. (Civ. Code, § 3283; and see Cal. Tort Damages (Cont.Ed.Bar 1988) § 1.6, p. 7, and cases cited therein.) While there is no clearly established definition of "reasonable certainty," evidence of future detriment has been held sufficient based on expert medical opinion which considered the plaintiff's particular circumstances and the expert's experience with similar cases.

For example, the expert in *Guerra* v. *Balestrieri* (1954) 127 Cal.App.2d 511, 518-519 [274 P.2d 443], based his opinion on future detriment on the fact plaintiff was still experiencing pain two years after the accident and his experience that " 'Frequently in this type of neck injury a patient will continue to have symptoms indefinitely' and 'It may last forever; . . . it may get worse; he may improve somewhat.'" The court held, "From such testimony the jury could reasonably conclude that plaintiff was reasonably certain to experience some pain and disability for the rest of his life." In *Ostertag* v. *Bethlehem Etc. Corp.* (1944) 65 Cal.App.2d 795, 805-806 [151 P.2d 647], plaintiff's expert testified, based on his examination of plaintiff, " '[I]t is reasonable to assume he is going to have trouble . . . in the future. Just how much, I don't know. Just what the course of that trouble will be, I don't know.'" The court found this testimony "sufficient to support a finding of future damages with reasonable certainty."

In the present case plaintiff's treating physician, basing his opinion on his examination of plaintiff after she left defendant's employment, testified she continued to suffer "a low grade depression throughout these years" and, assuming she suffered the incidents of sexual harassment she testified to, she would be affected psychologically in the future. The witness also testified people who have been sexually harassed in the work place continue to be affected psychologically as they continue to go through life. We conclude there was sufficient evidence of permanence of injury to justify the instruction.

## IV. THE AWARD OF COMPENSATORY DAMAGES WAS NOT EXCESSIVE.

Defendant attacks the award of compensatory damages as excessive. Specifically, it contends the court cannot award damages for future loss of earnings under a cause of action based on FEHA, or, if it can, the award can only be for a limited period. Defendant also contends the evidence does not support the awards for future loss of earnings and emotional distress.[8]

■ Defendant's first argument is easily disposed of. In *Commodore Home Systems, Inc.* v. *Superior Court* (1982) 32 Cal.3d 211, 215 [185 Cal.Rptr. 270, 649 P.2d 912], the Supreme Court held that notwithstanding the limitations on administrative remedies under FEHA, "FEHA does not limit the relief a court may grant in a statutory suit charging employment discrimination." Thus, "in a civil action under the FEHA, all relief generally available in noncontractual actions, including punitive damages, may be obtained." (*Id.*, at p. 221; and see *Watson* v. *Department of Rehabilitation* (1989) 212 Cal.App.3d 1271, 1294 [261 Cal.Rptr. 204].)

■ Defendant contends even if an award of damages for future loss of earnings is legally permissible, the award in this case is based on impermissible speculation Ms. Bihun would have been promoted to the next level, that she would have remained an AT&T employee throughout her working life and she would have earned more as an AT&T executive than she ever would as an attorney.

The evidence showed Ms. Bihun received nothing but excellent evaluations while employed by defendant and at the time the sexual harassment began she was rated "ready now" for promotion from level 5 to level 6. It is not mere speculation that had she remained at AT&T her qualifications would have led to this promotion. (Cf. *Ackerman* v. *Western Electric Co., Inc.* (N.D.Cal. 1986) 643 F. Supp. 836, 856.)

There was also sufficient evidence to support a finding that but for the sexual harassment Ms. Bihun would have remained at AT&T indefinitely. She was successful and happy there. She earned her law degree while an AT&T employee with the encouragement of her employer. The jury could reasonably conclude if she wanted to go into private practice she would have left AT&T when she passed the bar instead of remaining on the executive track. Testimony of her treating physician supports the conclusion Ms. Bihun chose to remain with AT&T instead of pursuing an independent law career. (Cf. *Drzewiecki* v. *H & R Block* (1972) 24 Cal.App.3d 695, 705 [101

---

[8]In round numbers, Ms. Bihun was awarded $686,000 for loss of future earnings and $662,000 for emotional distress.

Cal.Rptr. 169] [evidence of plaintiff's age, physical condition and excellent employment record supported finding plaintiff would have remained with employer another 10 years if not wrongfully terminated.]

As to the amount of lost earnings, the evidence showed that after five years with the public defender Ms. Bihun was earning less than she would have earned as a level 6 employee at AT&T in 1985, the year her employment was terminated. Furthermore, AT&T employees at Ms. Bihun's level can expect to receive annual bonuses; employees of the public defender cannot. We find this evidence showed a "reasonable probability" Ms. Bihun would continue to suffer a loss of earnings and the amount awarded by the jury is not unreasonable.

█ The award of $662,000 for emotional distress is well within the range of awards in similar cases. In *Watson v. Department of Rehabilitation, supra,* 212 Cal.App.3d at p. 1294, we upheld an award of $1,102,000 in a racial harassment case even though, unlike the present case, the plaintiff's psychotic disorder was not permanent. In *Wollersheim v. Church of Scientology* (1989) 212 Cal.App.3d 872, 905-906 [260 Cal.Rptr. 331] (vacated on other grounds (1991) 499 U.S. 914 [113 L.Ed.2d 234, 111 S.Ct. 1298]) we reduced an award for emotional distress from $5 million to $500,000 where the plaintiff's psychological injury was permanent, as is Ms. Bihun's, but not disabling. We note further the size of the award for emotional distress is not out of line with the economic damages awarded thus dispelling the notion the award of emotional distress damages was the result of passion or prejudice. (Cf. *Watson v. Department of Rehabilitation, supra,* 212 Cal.App.3d at p. 1295 (dis. opn. of Lillie, P. J.)

V. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN AWARDING ATTORNEY FEES AT THE RATE OF $450 PER HOUR FOR MR. GRASSINI.

█ Defendant attacks the attorney fees award in this action to the extent it is based on an hourly rate of $450 per hour to Ms. Bihun's lead counsel. The amount of attorney fees is within the sound discretion of the court and will not be reversed in the absence of a showing of clear abuse of that discretion. (*Johns v. Retirement Fund Trust* (1981) 117 Cal.App.3d 113, 116 [172 Cal.Rptr. 541].)

The trial court determined that a $450 hourly rate was a reasonable fee for Mr. Grassini's services based on his "knowledge, skill, experience and reputation." In setting the hourly fee the court was entitled to consider "fees customarily charged by that attorney and others in the community for similar work." (*Ackerman v. Western Elec. Co., Inc.* (9th Cir. 1988) 860 F.2d 1514,

1520.) We find the amount set by the trial court, albeit at the "high end," is not "off the scale" in light of the record.

## VI. THE TRIAL COURT PROPERLY AWARDED PREJUDGMENT INTEREST ON THE ENTIRE JUDGMENT.

Prior to trial, Ms. Bihun made an unapportioned settlement offer of $1.2 million to defendant AT&T and several of its defendant employees under Code of Civil Procedure section 998. Defendants rejected this offer. The jury returned a verdict awarding Ms. Bihun $1.5 million in compensatory damages and $500,000 in punitive damages. The trial court awarded prejudgment interest on the entire amount under the provisions of Civil Code section 3291.[9]

In its brief on appeal, AT&T claims the award of prejudgment interest was error because Civil Code section 3291 does not apply to statutory actions under FEHA. In the alternative, it argues section 3291 does not apply to punitive damages or to economic damages such as loss of wages. After briefing was completed, Division Five of this district filed its opinion in *Taing* v. *Johnson Scaffolding Co.* (1992) 9 Cal.App.4th 579 [11 Cal.Rptr.2d 820] holding an unapportioned settlement offer to multiple defendants too uncertain to support an award of prejudgment interest. AT&T wrote a letter to the court calling our attention to *Taing* and arguing under the holding in that case the unapportioned settlement offer in the present case cannot be the basis for prejudgment interest under Civil Code section 3291. Plaintiff replied with a letter arguing this issue was waived because it had not been raised in the trial court or in AT&T's briefs on appeal. At oral argument we granted both parties the opportunity to file letter briefs addressing the applicability of *Taing* to this case.

The first question we need to decide is whether the issue of an unapportioned settlement offer can be raised in this appeal.

As a general rule issues not raised in the trial court cannot be raised for the first time on appeal. (*Sea & Sage Audubon Society, Inc.* v. *Planning Com.* (1983) 34 Cal.3d 412, 417 [194 Cal.Rptr. 357, 668 P.2d 664].) However, appellate courts have made exceptions to this rule where the issue involved an important question of public policy (*Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644, 654 & fn.3 [209 Cal.Rptr. 682, 693 P.2d 261]); where

---

[9]Civil Code section 3291 provides in relevant part:

"In any action brought to recover damages for personal injury . . . [¶] . . . [I]f the plaintiff makes an offer pursuant to Section 998 of the Code of Civil Procedure which the defendant does not accept prior to trial . . . and the plaintiff obtains a more favorable judgment [the plaintiff is entitled to prejudgment interest]."

the issue raised a pure question of law, such as the interpretation and applicability of a statute (*State of California* ex rel. *Public Works Bd.* v. *Bragg* (1986) 183 Cal.App.3d 1018, 1023-1024 [228 Cal.Rptr. 576]); and where the issue involved a new point of law decided while the appeal was pending (*Claremont Imp. Club* v. *Buckingham* (1948) 89 Cal.App.2d 32, 33 [200 P.2d 47]).

In the present case the relevant facts are undisputed. At the time the settlement offer was made, the complaint contained two causes of action in which AT&T was not named as a defendant and as to which it would not have been vicariously liable: wrongful interference with business relationship and wrongful inducement of breach of contract. Thus, the case raises a pure question of law involving the interpretation and applicability of Civil Code section 3291 and Code of Civil Procedure section 998.

Prior to *Taing*, there were no cases involving the application of Civil Code section 3291 and Code of Civil Procedure section 998 to unapportioned settlement offers by one plaintiff to several defendants jointly. Thus, *Taing* involved a new point of law decided while this appeal was pending.

The applicability of Civil Code section 3291 and Code of Civil Procedure section 998 to unapportioned settlement offers made to multiple defendants arguably raises an issue of great public importance because it affects the state's policy of encouraging settlements and avoiding the time and expense of litigation. We also recognize a severe financial penalty may result from failure to accept a settlement offer and under some circumstances, such as those considered in *Taing*, the penalty may be unjust. (See discussion, *post*, at pp. 1000-1001.)

On the other hand, the interpretation and applicability of Civil Code section 3291 and Code of Civil Procedure section 998 to unapportioned settlement offers made to multiple defendants was decided in *Taing*. Thus, it is not necessary for *this* court to address the issue. To the extent the issue is one of great public importance, it has already been addressed in *Taing*.

Although *Taing* involved a new point of law decided while this appeal was pending, *Taing* was not a decision by the state's highest court resolving a matter of long-standing judicial controversy (cf. *Claremont Imp. Club* v. *Buckingham, supra*, 89 Cal.App.2d at p. 33), nor is the claim AT&T asserts one which, prior to *Taing*, "could not reasonably have been expected to [succeed]." (*Fisher* v. *City of Berkeley, supra*, 37 Cal.3d at p. 654, fn. 3.) Numerous cases prior to *Taing* had held unapportioned settlement offers to and from multiple *plaintiffs* were too uncertain to trigger Code of Civil

Procedure section 998 penalties because it could not be determined whether any individual plaintiff's recovery was more favorable than the offer. (*Taing, supra,* 9 Cal.App.4th at p. 583.) AT&T could have argued by analogy an unapportioned settlement offer to multiple defendants also creates uncertainty. (See *Taing, supra,* 9 Cal.App.4th at pp. 584-585.)

The most compelling reason for not allowing AT&T to raise the issue of an unapportioned settlement offer for the first time on appeal is that the settlement offer in this case did not put AT&T in the untenable position of the defendants in *Taing.* Therefore, no "manifest injustice" will result if AT&T is not allowed to add this issue to its appeal.

The plaintiff in *Taing* was a plasterer who was injured when he fell from a scaffold. Taing sued the scaffolding company, the general contractor and the owner of the building being plastered. Taing served an unapportioned settlement offer under Code of Civil Procedure section 998 on all three defendants. The offer expired without being accepted. Although Taing recovered a judgment against the scaffolding company greater than the settlement offer, the Court of Appeal held it was unfair to penalize that defendant for not accepting the settlement offer when the three defendants were not jointly liable for all the plaintiff's damages and there was no way the scaffolding company could have settled on its own with the plaintiff and obtained a good faith settlement determination under Code of Civil Procedure section 877.6. The scaffolding company's only course of action would have been to pay the entire amount of the settlement offer and then sue its codefendants for indemnity. This, the court stated, would defeat one of the benefits of Code of Civil Procedure section 998 and Civil Code section 3291: to avoid the time and expense of litigation. (*Taing, supra,* 9 Cal.App.4th 584-585.)

Here, AT&T was jointly liable with its employees on a respondeat superior or vicarious liability theory on every cause of action in which it was named as a defendant. It was not liable to plaintiff at all on the causes of action for wrongful interference with business relationship and wrongful inducement of breach of contract. Thus, unlike the scaffolding company in *Taing,* AT&T's principal dilemma was liability vel non, not apportionment of damages.

AT&T concedes the rationale of *Taing* does not apply in a case in which the defendants are jointly liable for the plaintiff's injury and there is no question of comparative fault. It argues, however, this is not such a case. Here, under theories of respondeat superior or vicarious liability, AT&T would be liable for damages caused by its employees' intentional or negligent infliction of emotional distress on plaintiff but it would not be liable for

its employees' torts of wrongful interference with business relationship or wrongful inducement of breach of contract. (*Dryden* v. *Tri-Valley Growers* (1977) 65 Cal.App.3d 990, 998-999 [135 Cal.Rptr. 720].) Thus, at the time of the settlement offer, the possibility existed only the employees would be found liable to plaintiff. Another possibility was that AT&T might be found liable for FEHA violations but not for wrongful termination on the theory the codefendant employees had conspired to induce the breach of contract. Given these possible scenarios, AT&T argues it was in the same untenable position as the scaffolding company in *Taing*.

We believe *Taing* is distinguishable from the present case on the ground *Taing* dealt with the problem of an unapportioned settlement offer to defendants who were not jointly liable for the full amount of the plaintiff's damages. Here, AT&T was jointly liable with its employees on a respondeat superior or vicarious liability theory for the full amount of damages on every cause of action in which AT&T was named as a defendant. It was not liable to plaintiff at all on the causes of action for wrongful interference with business relationship and wrongful inducement of breach of contract. Thus, unlike the scaffolding company in *Taing*, AT&T's principal dilemma was liability vel non, not apportionment of damages. As noted above, the fact the settlement offer included causes of action against the employees for which AT&T would not have been liable required an assessment by AT&T of *its* chances of being held *liable* to plaintiff; a different calculation from its assessment of whether it would suffer a damage award in excess of the settlement offer assuming its liability was established.

Even when there is only one defendant or the settlement offer is apportioned among several defendants a defendant must always assess its chances of being found liable to the plaintiff in determining how to respond to a settlement offer. Thus, the unapportioned settlement offer in the present case did not put AT&T in a dilemma not faced by every defendant who receives an offer of settlement under Code of Civil Procedure section 998.

We proceed now to consider the issue whether an action under FEHA for sexual harassment in the workplace is an action for "personal injury" within the meaning of Civil Code section 3291.

Civil Code section 3291 mandates the award of prejudgment interest in "any action brought to recover damages for personal injury sustained by any person resulting from or occasioned by the tort of any other person . . . ," where the defendant has rejected the plaintiff's settlement offer under Code of Civil Procedure section 998 and the plaintiff then obtains a more favorable judgment. (*Morin* v. *ABA Recovery Service, Inc.* (1987) 195 Cal.App.3d

200, 207 [240 Cal.Rptr. 509].) Interest runs from the date of the plaintiff's first offer under Code of Civil Procedure section 998 which is exceeded by the judgment. It is undisputed Ms. Bihun made a Code of Civil Procedure section 998 settlement offer of $1.2 million to all the defendants in this case and defendants did not accept the offer. It is also undisputed the total judgment of $2 million exceeded Ms. Bihun's settlement offer.

As framed by AT&T, the issues are: (1) whether sexual harassment is a "tort", (2) whether a statutory action under FEHA is an "action brought to recover damages for personal injury"; (3) whether Civil Code section 3291 applies to punitive damages; and (4) whether Civil Code section 3291 applies to economic damages such as loss of past or future wages.

 The fact sexual harassment is made actionable by statute does not make it any less a "tort" than battery, false imprisonment or negligence made actionable by common law. "[T]he word 'tort' means a civil wrong, other than a breach of contract, for which the law will provide a remedy in the form of an action for damages." (*Stephen K.* v. *Roni L.* (1980) 105 Cal.App.3d 640, 642 [164 Cal.Rptr. 618, 31 A.L.R.4th 383].) "It is well settled the Legislature possesses a broad authority . . . to establish . . . tort causes of action." (*Cory* v. *Shierloh* (1981) 29 Cal.3d 430, 439 [174 Cal.Rptr. 500, 629 P.2d 8].) Examples of statutory torts are plentiful in California law. (See, e.g., *Gladstone* v. *Hillel* (1988) 203 Cal.App.3d 977, 988 [250 Cal.Rptr. 372]; *Fullerton* v. *International Sound Technicians* (1961) 194 Cal.App.2d 801, 813 [15 Cal.Rptr. 451].)

AT&T argues a civil action brought under FEHA in general, and this action in particular, is not an action "brought to recover damages for personal injury" as required by Civil Code section 3291. Instead, it is an action to recover damages for economic injury, e.g., lost wages. Damages for personal injury, e.g., emotional distress, may or may not be an ancillary remedy.

 Defendant correctly states the applicability of Civil Code section 3291 depends on the primary purpose of the cause of action. In *Gourley* v. *State Farm Mut. Auto. Ins. Co.* (1991) 53 Cal.3d 121, 123 [3 Cal.Rptr.2d 666, 822 P.2d 374], the court held prejudgment interest under Civil Code section 3291 "is not available in insurance bad faith actions because such actions are brought primarily to recover *economic loss* caused by the tortious interference with a property right, and any damages recovered for actual personal injury, including emotional distress, are incidental to the award of economic damages." (Italics in original.) In a footnote following the quoted sentence the court made clear its opinion "in no way affects a plaintiff's right to

recover section 3291 interest in a personal injury action where plaintiff also seeks to recover separate property damages." (*Id.*, at p. 123, fn. 1.) Thus, if the primary purpose of a FEHA cause of action is to allow the plaintiff to recover for personal injury then the plaintiff is entitled to prejudgment interest even if she also seeks to recover for injury to a property right. But, if a cause of action under FEHA is primarily for recovery of financial loss then the plaintiff is not entitled to prejudgment interest under Civil Code section 3291 even if she also seeks to recover for personal injury.

In support of its claim a statutory action under FEHA is primarily an action to recover for economic loss, defendant points to the fact FEHA provides a cause of action for discrimination in the *workplace*. Government Code section 12920 declares "as the public policy of this state that it is necessary to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold *employment* without discrimination . . . ." (Italics added.) Discrimination and harassment are declared to be "unlawful *employment* practice[s]." (Gov. Code, § 12940, italics added.) Furthermore, where discrimination is proven the remedies available to the Fair Employment and Housing Commission are directed to preventing and curing economic damages, e.g., injunctive relief, back pay, reinstatement, and front pay. The commission may not award compensatory or punitive damages. Defendant points out a statutory cause of action would not be necessary to protect an individual from personal injuries caused by sexual harassment. Psychological damage caused by verbal conduct such as epithets or slurs can be remedied by an action for intentional infliction of emotional distress. (See *Rojo* v. *Kliger* (1990) 52 Cal.3d 65, 81 [276 Cal.Rptr. 130, 801 P.2d 373]; *Alcorn* v. *Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 497-498 [86 Cal.Rptr. 88, 468 P.2d 216].) Physical conduct such as touching or interference with normal work or movement can be remedied by actions for assault, battery or false imprisonment. (See Oppenheimer & Baumgartner, *Employment Discrimination and Wrongful Discharge: Does the California Fair Employment and Housing Act Displace Common Law Remedies?* (1989) 23 U.S.F.L.Rev. 145, 181.) On the other hand, conduct such as failure to promote or discharging an individual for refusal to perform sexual favors would not be actionable but for a statutory cause of action.

Plaintiff responds a civil action under FEHA is defined by personal injury, not economic loss. Indeed, "[l]oss of tangible job benefits shall not be necessary in order to establish harassment." (Gov. Code, § 12940, subd. (h); *Fisher* v. *San Pedro Peninsula Hospital, supra*, 214 Cal.App.3d at p. 608.) The Fair Employment and Housing Commission has stated " 'conduct amounting to sexual harassment . . . is itself unlawful under [FEHA], whether or not the harassment also results in the loss of some more tangible

employment benefit.' " (214 Cal.App.3d at p. 608.) The commission has also stated: " 'Sexual harassment creates a hostile, offensive, oppressive, or intimidating work environment and deprives its *victim* of her statutory right to work in a place free of discrimination, when the sexually harassing conduct sufficiently *offends, humiliates, distresses or intrudes upon its victim*, so as to disrupt her emotional tranquility in the workplace, affect her ability to perform her job as usual, *or otherwise interferes with and undermines her personal sense of well being.*' " (*Ibid.*, italics added.) Plaintiff also notes it is precisely because the commission cannot award damages for personal injuries such as emotional distress that a private right of action is provided in the statute. (*Peralta Community College Dist.* v. *Fair Employment & Housing Com.* (1990) 52 Cal.3d 40, 55 [276 Cal.Rptr. 114, 801 P.2d 357].)

Plaintiff correctly observes it is not the relative size of the personal injury award compared to the property damage award which determines whether the action is one "brought to recover damages for personal injury." Rather, it is the nature of the action itself which controls. Thus, in *Gourley*, the court stated breach of the implied covenant of good faith and fair dealing "is actionable in the insurance context because such conduct causes financial loss to the insured, and it is that loss which defines the cause of action." (53 Cal.3d at p. 129.) The court noted its decision would have been the same regardless of the comparative size of the monetary damages compared to emotional distress damages. (*Id.*, at p. 125, fn. 2.) On the other hand, the court in *O'Hara* v. *Storer Communications, Inc.* (1991) 231 Cal.App.3d 1101, 1118-1119 [282 Cal.Rptr. 712] held a defamation action is one for personal injury and therefore the plaintiff was entitled to prejudgment interest on her special damages, which are purely economic, even though she was awarded no general damages which are purely personal.[10]

We have concluded sexual harassment in the workplace is a personal injury within the meaning of Civil Code section 3291.

As early as 1915, the United States Supreme Court declared "the right to work for a living in the common occupations of the community is of the very essence of the *personal freedom* and opportunity that it was the purpose of [the Fourteenth] Amendment to secure." (*Truax* v. *Raich* (1915) 239 U.S. 33, 41 [60 L.Ed. 131, 135, 36 S.Ct. 7], italics added.) Even before that, the California Constitution declared: "No person shall, on account of sex be disqualified from entering upon or pursuing any lawful business, vocation or profession." (Cal. Const., art. XX, § 18 (1879) see now art. I, § 8 (1974).)

---

[10]Under Civil Code section 48a, [¶] 4: "(a) 'General damages' are damages for loss of reputation, shame, mortification and hurt feelings; (b) 'Special damages' are all damages . . . in respect to . . . property, business, trade, profession or occupation . . . ."

Our Supreme Court has consistently interpreted this provision and the equal protection clause of the Fourteenth Amendment as conferring a personal right on women to be free to engage in any business, vocation or profession permitted to men. (*In re Maguire* (1881) 57 Cal. 604, 608; *Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1, 5, 20 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351].)

" 'An injury is personal when it impairs the well-being or the mental or physical health of the victim.' " (*O'Hara* v. *Storer Communications, Inc.*, *supra*, 231 Cal.App.3d at p. 1118, quoting *Miller* v. *Carnation Co.* (1977) 39 Colo.App. 1 [564 P.2d 127, 132].) It is beyond dispute sexual harassment in the workplace has this effect. As one commentator familiar with the subject put it, "[Sexual] harassment exists in terribly harsh, ugly, demeaning, and even debilitating ways. . . . It is a form of violence against women as well as a form of economic coercion . . . ." (Hill, *The Nature of the Beast* (1992) 65 So.Cal.L.Rev. 1445, 1447-1448.) The mere fact sexual harassment occurs in the workplace does not convert the invasion of a personal right into the invasion of an economic one. "The gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.' " (*Meritor Savings Bank* v. *Vinson* (1986) 477 U.S. 57, 68 [91 L.Ed.2d 49, 60-61, 106 S.Ct. 2399].)

Even in the case of so-called "quid pro quo" harassment, the principal injury is personal, not economic. Threats involving actual job benefits may never be expressed. They may never have to be. The victim may capitulate to a supervisor's demands or tolerate an offensive environment because of a perceived, albeit unarticulated, threat to his or her employment status. In that event, tangible job benefits may never be actually threatened but toleration of the harassment is, in effect, a "quid pro quo" not only for the job-related benefits but for the job itself. Where an employee is constructively discharged because the employee can no longer tolerate the supervisor's sexual harassment, or is fired in retaliation for opposing the supervisor's conduct, the employee has already suffered from a "hostile environment." Thus, "quid pro quo" and "environmental" harassment are not distinct forms of sexual harassment but more like poles of a continuum rooted in violation of the personal right to be free from unwanted and unwelcome sexual advances.

For these reasons we conclude a sexual harassment claim under FEHA seeks to vindicate decidedly personal rights.

Having determined a statutory action under FEHA comes within the ambit of Civil Code section 3291 we turn to the question whether prejudgment interest applies to the entire judgment or only portions thereof. In *Greenfield*

v. *Spectrum Investment Corp.* (1985) 174 Cal.App.3d 111, 124-125 [219 Cal.Rptr. 805], we held that when damages are awarded on a single cause of action for personal injury "a plaintiff may claim prejudgment interest under Civil Code section 3291 as to both compensatory and punitive damages." We based this holding on the statute's provision "the *judgment* shall bear interest . . . ." (Italics added.) We concluded "the utilization of the term 'judgment' in Civil Code section 3291 [implies] both compensatory and punitive damages are encompassed therein and prejudgment interest on the punitive damages should be allowed."

 Defendant contends prejudgment interest is only applicable to damages for emotional distress because those are the only damages related to Ms. Bihun's personal injury. Defendant relies on *Morin* v. *ABA Recovery Service, Inc., supra,* 195 Cal.App.3d at page 208, in which the court held Civil Code section 3291 authorizes prejudgment interest "only for the personal injury portion of a more general total recovery." In *Morin,* the court remanded the case to the trial court to try to determine the portion of the verdict attributable to plaintiff's personal injury claim or, if it could not so determine, to deny prejudgment interest. (195 Cal.App.3d at p. 212.)

*Morin* is distinguishable from the case before us and from *Greenfield.* In *Morin* the plaintiff went to trial on causes of action for intentional infliction of emotional distress and possession of personal property. (195 Cal.App.3d at p. 203.) Under the facts of the case, it was possible some or even all of the damages awarded were attributable to the cause of action for possession of personal property. In contrast, the lost wages and punitive damages claimed in the present case were based on a single cause of action under FEHA for sexual harassment, which we have held is a personal injury.

Accordingly, Ms. Bihun is entitled to interest measured as a percentage of the entire judgment.

DISPOSITION

The judgment is affirmed.

Lillie, P. J., and Woods (Fred), J., concurred.

A petition for a rehearing was denied March 25, 1993, and the opinion was modified to read as printed above.